**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BROTHERHOOD OF LOCOMOTIVE** | : | **CIVIL ACTION** |
| **ENGINEERS AND TRAINMEN,** | : | |
| **MARTIN G. CROTHERS, AND** | : | |
| **GEORGE H. TOMPKINS,** | : | |
| **Plaintiffs** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **UNITED TRANSPORTATION UNION,** | : | |
| **NATIONAL RAILWAY LABOR** | : | |
| **CONFERENCE, CSX** | : | |
| **TRANSPORTATION, INC., KANSAS** | : | |
| **CITY SOUTHERN, NORFOLK** | : | |
| **SOUTHERN RAILWAY COMPANY,** | : | |
| **AND UNION PACIFIC RAILROAD** | : | |
| **Defendants** | : | **No. 04-5491** |

## Memorandum and Order

**Gene E.K. Pratter, J.**                                              **February 10, 2006**

      Plaintiffs Brotherhood of Locomotive Engineers and Trainmen, Martin G. Crothers and

George H. Tompkins move for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure 12(c) in this case.  Defendants United Transportation Union, BNSF Railway

Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern

Railway Company, and Union Pacific Railroad Company, in two separate submissions,[1] move

for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  Counsel ably and

effectively explained their respective positions in a highly competent and professional manner.

---

[1]  United Transportation Union filed a motion for summary judgment on June 9, 2005, and National Railway Labor Conference and the remaining railroad defendants filed a second motion for summary judgment on June 10, 2005.  The National Railway Labor Conference was dismissed from this case by this Court's Order dated June 10, 2005.

They present this Court with issues not yet addressed by the Third Circuit Court of Appeals and that require careful tracking through specialized legislation.  For the reasons outlined below, Plaintiffs' motion will be denied and the summary judgment motions will be granted.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs Martin Crothers and George Tompkins are employees of Railroad Defendant CSX and members of Plaintiff Brotherhood of Locomotive Engineers and Trainmen (the "BLET").  Mr. Crothers is employed as a locomotive engineer and holds seniority in the train service classification.  Mr. Tompkins is trained as a locomotive engineer, but he performs service primarily in the train service craft or class.  Messrs. Crothers and Tompkins assert that they are both citizens of Pennsylvania and reside in the Eastern District of Pennsylvania.  BLET is an unincorporated labor organization with a principal place of business in Cleveland, Ohio.

BLET is the collective bargaining representative for *locomotive engineers* employed by the defendant railroads, which include BNSF Railway Company, CSX Transportation, Inc., Kansas City Southern Railway Company, Norfolk Southern Railway Company, and Union Pacific Railroad Company (the "Railroad Defendants"). United Transportation Union ("UTU"), also an unincorporated labor organization, is the collective bargaining representative for *train service* employees of the Railroad Defendants.  Federal jurisdiction over this dispute is grounded in 28 U.S.C. § 1331, as a dispute under the Railway Labor Act.

The Railroad Defendants employ both *train service* and *engine service* persons who are members of BLET, and some of the engine service persons hold train service seniority. Occasionally, the seniority of some of the engine service employees is not sufficient to permit them to hold any available engine service positions.  When this occurs, these employees are

2

permitted to exercise their train service seniority.  Therefore, some employees alternate working in train service and engine service, thereby involving the interests of both BLET and UTU.  Id.

The source of the present dispute is a Letter of Intent (the "LOI") that was entered into between UTU and the Railroad Defendants.  The LOI was executed on November 1, 2004, and its apparent purpose was to address concerns of the UTU with respect to financial burdens it allegedly incurs from "representing and protecting the rights and interests of employees working (or holding seniority in) train service" who do not pay dues or provide any other financial support to UTU.[2]  While the specific detail will be discussed below, the disputed terms of the LOI are those that impose fees on non-UTU members in order continue to maintain and/or retain seniority status with respect to train service positions.  The terms of the LOI apply to each of the Railroad Defendants and, by extension, to their employees.

In the Complaint, Plaintiffs allege that (1) the LOI violates Section 2, Fourth of the Railway Labor Act (the "RLA"), in that it coerces employees into joining the UTU; (2) by coercing employees to join, UTU has violated its duty of fair representation under the RLA and the remaining Defendants violated the RLA by conspiring with UTU in this coercion; (3) Defendants have violated Pennsylvania common law by participating in a civil conspiracy; and (4) a declaratory judgment that the LOI violates the RLA and is, therefore, void ab initio, is warranted.  In addition to declaratory relief, Plaintiffs ask (1) that the Court enjoin enforcement of the LOI, (2) that the Court order the Defendants to refund monies collected thereunder, and (3)

---

[2]  As stated in the Letter of Intent, UTU is a designated collective bargaining representative of a craft under the Railway Labor Act, and must represent every employee working or holding seniority in the craft with respect to contract bargaining/administration and claim and grievance handling.  LOI at 1.

3

that the Court order that all employees suffering injury as a result of the Defendants' conduct be made whole, including receipt of an award of compensatory damages, reinstatement, back pay and restoration of all benefits, including seniority rights.

The motions presently before the Court are the Plaintiffs' Motion for Judgment on the Pleadings, UTU's Motion for Summary Judgment, and the Railroad Defendants' Motion for Summary Judgment.

LEGAL ANALYSIS

I.   **Standard of Review**

1.   **Judgment on the Pleadings**

Federal Rule of Civil Procedure 12(c) states that "[a]fter the pleadings are closed but within such time so as not to delay the trial, any party may move for judgment on the pleadings." FED. R. CIV. P. 12(c).  Judgment on the pleadings will not be granted unless the movant clearly establishes that there are no material issues of fact, and that he or she is entitled to judgment as a matter of law.  Sikirica v. Nationwide Ins. Co., 416 F.3d 214, 219-20 (3d Cir. 2005).  In deciding a motion for judgment on the pleadings, a court must view the facts presented in the pleadings and draw any inferences therefrom in a light most favorable to the non-moving party.  Id.  If matters outside the pleadings are presented to and not excluded by the court on a motion for judgment on the pleadings, the motion shall be treated as one for summary judgment and disposed of as provided in Federal Rule of Civil Procedure 56.  FED. R. CIV. P. 12(c).[3]

---

[3]  The relevant terms of the LOI were included as part of the Complaint, and the entire LOI was attached to the Plaintiffs' Motion for Judgment on the Pleadings.  Moreover, because all of the claims are based on the LOI, it is appropriate to consider the LOI as part of the pleadings.

2.    **Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). Summary judgment is appropriate if the non-moving party fails to make a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

Although the parties here have assigned different captions to their respective motions, at

5

oral argument they concurred that the papers submitted provide sufficient information for the Court to decide the issue of liability with respect to the LOI as a matter of law.  Oral Argument Tr. at 22:18-23; 40:8-11.

## II.    **Violation of Railway Labor Act**

The provisions of the LOI that are in dispute address situations in which an employee who is a member of one rail union moves to work in a new class which would require representation by the other rail union.  For example, a train service employee represented by UTU might be promoted to engine service and would then be represented by BLET.  These transitions, which are common in the railroad industry, have given rise to difficulties between unions that are expected to represent a certain number of non-members at any given time.

At oral argument on the Motions, counsel for Plaintiffs succinctly summarized the purported invalidity of the LOI provisions as "a violation of Section 2, Fourth [of the RLA], not excused by Section 2, Eleventh."  Oral Arg. Tr. at 17:16-17.  Counsel specifically argued that by its terms, the LOI interferes with "employee employment rights, in coercion of employees with respect to their seniority rights," in violation of the prohibition of Section 2, Fourth of the RLA against obtaining monies from non-union members for any purpose.  Oral Arg. Tr. at 18:8-10. Moreover, Plaintiffs argue, the provisions of the LOI are not saved by exceptions set forth in Section 2, Eleventh which allow union shop and dues check-off agreements because Section 2, Eleventh must be construed as a narrow exception only available to address the problem of "free riders," or non-union member employees who a union is obligated by law to represent.

Plaintiffs also argue that to the extent that the LOI is found to violate Section 2, Fourth, the Defendants have breached their duty of fair representation under the RLA because the non-

UTU member employees are receiving disparate treatment. Finally, in a related state-law claim, Plaintiffs argue that by working in concert with the unlawful purpose of compelling the payment of impermissible dues, fees and assessments, the Defendants have violated Pennsylvania common law against civil conspiracy.

A.      **Relevant Sections of the LOI**

Plaintiffs' argument focuses on two sections of the LOI, Sections 2 and 3. Section 2 provides that employees holding a train service position (as represented by UTU) who are not members of UTU must pay a "seniority maintenance" fee "in order to continue to accumulate train service seniority."[4] If these payments are not made, the train service employee risks having his or her seniority in the train service class frozen.

Section 3 of the LOI addresses "seniority retention" issues for engine service employees (represented by BLET), and states that if a carrier has arrangements with BLET requiring an engine service employee who is a non-BLET member to pay a service fee to continue to accumulate engine service seniority, any non-UTU member working in an engine service position but holding train service seniority must pay an amount equal to full monthly dues to

_____

[4] This section states that "[e]ach employee in a train service class/craft (including locomotive engineer trainees) represented (for RLA purposes) by the UTU who does not hold membership in that organization will be required to pay a monthly seniority maintenance ("SM") fee to UTU in order to continue to accumulate train service seniority. . . If an employee covered by this paragraph is promoted to engine service and is subsequently sent back to train service at a location where this provision has been implemented, a new SM services period (as defined above) will be applicable to such employee." LOI at § 2(a).

The LOI further provides that "any non-member of UTU in train service who fails to pay the SM fee when due shall be promptly notified of that non-payment . . .," and that "[i]f such default has not been cured within thirty (30) calendar days after the date of such notice . . . that individual's seniority in the train service class/craft involved shall be frozen effective on the first calendar day after expiration of the 30-day notice period." LOI at § 2(b).

UTU in order to retain their seniority.  Section 3 further provides that non-payment of this fee

would result in extinguishment of the employee's train service seniority.  <u>LOI</u> at § 3(b).[5]  An

affected employee that has had his or her seniority status extinguished and is "set back to train

service" to work, "shall be placed at the bottom of the seniority roster involved," is "deemed to

have forfeited all agreement-based rights and/or benefits for which he/she was entitled or eligible

based upon his or her former train service seniority."  <u>LOI</u> at § 3(d).

        B.      **Relevant Sections of the RLA**

Section 2, Fourth of the RLA, which provides a framework for organizing workers and

for collective bargaining, prohibits an employer from using coercive tactics to convince an

employee to join or not to join a union.[6]  Section 2, Fourth also prohibits the imposition of

automatic "check-off" agreements by which an employee's union membership dues and other

---

[5]  This section of the LOI specifically states that "[i]f arrangements are in effect at any location on a carrier that require payment of a service fee by an employee in *engine service* who does not belong to the Brotherhood of Locomotive Engineers and Trainmen in order to continue to accumulate and/or retain engine service seniority," the following provision applies:

> Any employee in engine service (except locomotive engineer trainees) who holds train service seniority but does not belong to the UTU shall be required to pay a monthly seniority retention ("SR") fee to the UTU, in an amount equal to the full monthly dues payable to UTU and its subordinate units by a member of that organization, in order to retain train service seniority.  <u>LOI</u> at § 3(b).

[6]  Section 2, Fourth states that "[e]mployees shall have the right to organize and bargain collectively through representatives of their own choosing. . . . No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, . . . or to influence or coerce employees in an effort to induce the them to join or remain or not to join or remain members of any labor organization."  45 U.S.C. § 152, Fourth.

expenses are deducted from the employee's wages.[7]  Additionally, Section 2, Fifth prohibits an employer from requiring an employee to sign an agreement promising to join or not to join a labor union.[8]

Section 2, Eleventh of the RLA, in turn, provides an exception to the prohibitions of Section 2, Fourth, allowing carriers and labor organizations, under certain circumstances, to negotiate a "union shop."[9]  Where a union shop is permitted, Section 2, Eleventh (b) provides that a carrier and labor organization may enter into a "check-off" agreement with its employees, allowing for the deduction of dues and other payment from wages upon written and voluntary authorization by the employee.[10]  Finally, Section 2, Eleventh (c) addresses a problem that is unique to railroad employees who transition between train and engine craft positions

---

[7]  Section 2, Fourth states that an employer may not deduct from the wages of employees "any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection" of such items.  45 U.S.C. § 152, Fourth.

[8]   Section 2, Fifth states that "[n]o carrier, its officers, or agents shall require any person seeking employment to sign any contract or agreement promising to join or not to join a labor organization. . . ."  45 U.S.C. § 152, Fifth.

[9]  Section 2, Eleventh(a) states that "[a]ny carrier or carriers . . . and a labor organization or labor organizations duly designated and authorized to represent employees in accordance with the requirements of this chapter shall be permitted . . . to make agreements, requiring, as a condition of continued employment . . . that . . . all employees shall become members of the labor organization representing their craft or class: *Provided* that no such agreement shall require such condition of employment with respect to employees to whom membership is not available upon the same terms and conditions as are generally applicable to any other member . . . ."  45 U.S.C. § 152, Eleventh(a).

[10]  Section 2, Eleventh(b) states that, upon "written assignment to the labor organization" by an employee "providing for the deduction . . . from the wages of . . . employees in a craft or class" for payment to the labor organization representing such craft or class for "periodic dues, initiation fees, and assessments uniformly required as a condition of acquiring or retaining membership," dues may be deducted from an employees' wages.  45 U.S.C. § 152, Eleventh (b).

periodically: the expensive conflict that arises when a craftsperson must maintain membership in two unions in order to enjoy union protections.[11]  Section 2, Eleventh(c) was designed to alleviate this conflict by preventing "compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts." Pennsylvania Railroad Co. v. Rychlik, 352 U.S. 480, 492 (1957).

      1.     **Coercion to Join UTU**

The recurring element underlying Plaintiffs' arguments with respect to the RLA is coercion.  That is, Plaintiffs argue that because the LOI requires non-UTU members to remit payments to UTU in order to continue to accumulate and/or retain seniority, the members are effectively being coerced to join UTU, in violation of Section 2, Fourth.  Plaintiffs further argue that the LOI provisions are not permitted within the Section 2, Eleventh(b) exception allowing for check-off agreements because that section allows for such payments when they are voluntarily made, and not required.  Thus, Plaintiffs argue, the elements of Section 2, Fourth and Eleventh cannot be analyzed singularly, but must be considered together.

Plaintiffs support their interpretation of the RLA with Brady v. Trans World Airlines, Inc., 401 F.2d 87 (3d Cir. 1967).  In Brady, the plaintiff was a union employee and shop steward who disagreed with the procedure followed by the union to establish an increase in union dues for persons in his classification.  Brady, 401 F.2d at 89.  In protest, the plaintiff continued paying his dues at the previous rate and, as a result, was cited by the union as having violated the union's

---

[11]  Section 2, Eleventh(c) provides that the requirement of membership in a labor organization shall be met "if said employee shall hold or acquire membership in *any one* of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services."  45 U.S.C. § 152, Eleventh (c) (emphasis added).

constitution.  Id. at 91.  Ultimately, the union sent the plaintiff's employer a certification for

discharge because the plaintiff had violated the union security provisions of the collective

bargaining agreement, and the plaintiff lost his job for failing to pay his union dues.  Id.  The

plaintiff then sued both the union and his former employer, arguing that the union had breached

its duty of fair representation by discriminating against him and that the employer had violated

the RLA by terminating him.

The Brady court upheld a finding that the employer was liable under Section 2, Fourth of

the RLA because "[a] discharge under a union security clause for failure to comply with the

union's dues demands inherently encourages other employees to promptly comply with union

'membership' requirements," thereby encouraging, or coercing, union membership.  Brady, 401

F.2d at 101.[12]  In so holding, the Brady court specifically rejected the defendant employer's

---

[12]  At oral argument, counsel for the Plaintiffs noted that the Brady court relied in part on Radio Officers' Union of Commercial Telegraphers Union v. National Labor Relations Board, 347 U.S. 17 (1954).  In Radio Officers, the Supreme Court addressed three separate cases in which employers were charged with violating the National Labor Relations Act by providing incentives for union members, thereby encouraging membership in a particular union.  In one of the cases, an employee who had his seniority status reduced for failure to pay his union dues was found to have suffered coercion to join the union, an affront under the NLRA in the absence of a valid union security agreement.

In discussing the need to establish "specific evidence of intent to encourage or discourage" union membership, as forbidden by Section 8(a)(3) of the NLRA, the Court in Radio Officers stated that "encouragement and discouragement are subtle things requiring a high degree of introspective perception," and concluded that the National Labor Relations Board did not err in inferring that by conferring certain benefits on union members only, the employers encouraged union membership.  Radio Officers, 347 U.S. at 51.

While the NLRA and the RLA might share some similarities, the Supreme Court has cautioned against the wholesale importation of the NLRA "into the railway labor arena."  Trans World Airlines, Inc. v. Independent Federation of Flight Attendants, 489 U.S. 426, 439 (1989).  In Trans World Airlines the Court further warned that "[e]ven rough analogies must be drawn circumspectly with due regard for the many differences between the statutory schemes."  Id.  In

argument that in order to conclude that Section 2, Fourth's coercion provisions had been violated by an employer, a plaintiff had to demonstrate that the employer had reason to know that the employee's union membership was terminated for a reason other than failure to pay union dues. Id. at 100.

Plaintiffs concede that the issue in Brady was substantively different from the one presented in this case, but argue that the principles set forth by the Court of Appeals for the Third Circuit with respect to interpreting the RLA are germane here.  Oral Arg. Tr. at 14:4-9.  At oral argument, counsel for Plaintiffs specifically argued that "Brady stands for the proposition that Section 2, Fourth prohibits the very conduct that the LOI permits, unless the LOI qualifies for the safe harbor set forth in Section 2, Eleventh."  Oral Arg. Tr. at 11:4-7;14:6-9.  Counsel for Plaintiffs therefore argues that by limiting or extinguishing an engineer's seniority in UTU, the Defendants inherently encourage all BLET members to either quit BLET and join UTU or to join both unions.   Plaintiffs assert that the only real distinction between this case and Brady lies in

_____

Brady, the court specifically declined to adopt the "intent standard" set forth in Section 8(a)(3) of the NLRA.

Moreover, even if the tenets regarding inference were to be adopted by this Court, there are important distinctions between Radio Officers and the present case that are significant and relevant.  In this case, requiring payment of a fee to maintain or retain seniority merely gives employees an option as to which union to choose to continue seniority; it does not have the effect of terminating employment entirely.  That is, if an employee opted not to retain his or her seniority in the UTU, he or she could still be employed there but would drop to the bottom of the seniority list *for that union*.  It bears observing that a reason for the existence of a separate statute for the railway industry is the unique nature of its crafts.  Thus, the absence of seniority in one union does not mean that a railway employee will fail to work, but only that the employee, if opting not to pay the seniority maintenance or retention fee, will have less seniority in UTU. Presumably, this is a strategic decision that may be made by the employee.  That is, an employee who feels well established in BLET may opt not to continue accruing or retaining seniority in UTU.  This was not the case in Radio Officers, where the employee who lost seniority had no other employment option.

the nature of the coercion, and that "the loss of seniority rights is every bit as coercive as a loss of employment." Oral Arg. Tr. at 14:16-18.

In contrast, Defendants assert that Brady is not dispositive here because the interpretation of Section 2, Fourth set forth in Trans World Airlines, Inc. v. Independent Federation of Flight Attendants, 489 U.S. 426 (1989) supercedes the Brady analysis. In Trans World Airlines, a flight attendants union sought a declaratory action seeking the displacement of newly hired flight attendants and less senior crossover employees to reinstate workers who had gone on strike. Trans World Airlines, Inc., 489 U.S. at 431. The plaintiff union argued that the strikers were entitled to reinstatement either under the terms of their pre-strike collective bargaining agreement or under the terms of the RLA. Id. In Trans World Airlines the Court framed the issue as "whether, at the end of a strike, an employer is required by the Railway Labor Act . . . to displace employees who worked during the strike in order to reinstate striking employees with greater seniority." Trans World Airlines, Inc., 489 U.S. at 428.

In analyzing the issue, in Trans World Airlines, the Court reviewed the purpose of Section 2, Fourth and, after noting that this portion of the RLA was enacted as an amendment to the statute in 1934, stated that the amendments should be construed "as addressing primarily the precertification rights and freedoms of unorganized employees." Id. at 441. The Court then concluded that although this view did not suggest that there was no statutory basis for limiting the activities of parties during the post-negotiation/post-certification period, courts should "hesitate to imply limitations on all but those forms of self-help that strike a fundamental blow to union or employer activity and the collective bargaining process itself." Id. at 442.

Thus, the Defendants suggest that the Brady interpretation of Section 2, Fourth and

Eleventh must be "glossed by the holding [of <u>Trans World Airlines, Inc.</u>] where [the Court] made it clear that Section 2, Fourth is chiefly addressed to pre-certification before any unions are certified in order to protect the rights to organize freely by the employees themselves . . . ." <u>Oral Arg. Tr.</u> at 31:1-6.  Defendants no doubt believe they have built up a head of steam behind this reasoning as a result of a line of several subsequent cases in which other circuit courts of appeal have reviewed seniority maintenance and seniority retention agreements and concluded that these agreements do not violate the RLA.

The first case to consider this type of agreement after <u>Trans World Airlines</u> was <u>Dempsey v. Atchison, Topeka and Santa Fe Railway Co.</u>, 16 F.3d 832 (7th Cir. 1994).  In <u>Dempsey</u>, the United Transportation Union had negotiated a "union shop" agreement with the carrier and, in the context of negotiations for crew reductions, a side letter was negotiated requiring employees who were transferred to engine service and wished to continue accumulating additional seniority in train service to pay monthly dues to United Transportation Union.  <u>Dempsey</u>, 16 F.3d at 834. The BLET, along with some of its members, sued, arguing that the side letter violated Section 2, Fourth and Eleventh of the RLA.  The <u>Dempsey</u> court rejected BLET's arguments.

Plaintiffs' first argument in <u>Dempsey</u> was that the side letter violated Section 2, Eleventh because it required dual union membership.  Rejecting this argument, the court reasoned that the side letter was "wholly outside the realm of Section 2, Eleventh (c)" because the side letter would not be considered a union shop agreement under Section 2, Eleventh(a).  Moreover, the court noted, plaintiffs failed to demonstrate that the side letter would force transferred employees to join multiple unions *as a condition of continued employment*, rather than for the purpose of maintaining seniority.  <u>Id</u>. (emphasis in original).  While the plaintiffs argued that the

14

requirement constituted a *de facto* condition of employment, the court disagreed, noting that

Section 2, Eleventh of the RLA does not guarantee transferring employees the right to continue

accruing seniority, but that these rights arise out of the collective bargaining agreement itself.

As for violating Section 2, Fourth, the Dempsey court concluded that, in light of Trans

World Airlines, to assert such a violation in a post-certification context a plaintiff must

demonstrate that the offending activities "strike a fundamental blow to union or employer

activity and the collective bargaining process itself." Dempsey, 16 F.3d at 841.  Because the

plaintiffs provided no evidence of anti-union animus in the negotiation of the letter, the court

found that the side letter did not violate Section 2, Fourth.

Next, in Brotherhood of Locomotive Engineers v. Kansas City Southern Railway Co., 26

F.3d 787 (8th Cir. 1994), the engineers union sued the train service craft union and several

railroad carriers to enjoin the enforcement of a "side letter" to a labor agreement between the

United Transportation Union and the carriers.  The terms of the side letter required train service

employees transferring to engine service to continue paying dues to the United Transportation

Union if they wished to continue to accrue train service seniority.  Kansas City Southern Railway

Co., 26 F.3d at 790.[13]   The court observed that "the practical effect . . . of a train service

employee's failure to pay dues to UTU after transfer to engine service when engineer positions

---

[13] In Kansas City Southern Railway, the effect of an employee's failure to pay the
required dues was to freeze the employee's train service seniority at the level it was when he or
she moved to engine service, but did not reduce train service seniority already earned during the
employee's tenure with the carrier.  Id.  Citing to National Labor Relations Board v. Manitowoc
Engineering Company, 909 F.2d 964, 969-71 (7th Cir. 1990), cert. denied 498 U.S. 1083 (1991),
the Dempsey court intimated that a letter requiring the payment of dues in order to preserve
already-acquired seniority in train service might offend the RLA.  Dempsey, 16 F.3d at 838.
However, in Wightman v. Springfield Terminal Railway Company, 100 F.3d 228 (1st Cir. 1996),
discussed herein, the court found otherwise.

are cut back may find themselves unable to return to train service if they have been bypassed in seniority by more junior employees who have less continuous service with [the carrier] overall but more accumulated train service seniority as a UTU member." Id. at 790-91.

The Brotherhood of Locomotive Engineers sued, arguing that (1) as an "interested party," it was entitled to notice and an opportunity to participate in the negotiations of the side letter; (2) the side letter violated Section 2, Eleventh of the RLA because is forced employees to join UTU, thereby creating an invalid "union shop"; and (3) the side letter illegally arranged for the deduction of union dues from employee wages and interfered with, influenced and coerced employees to induce them to join or remain members of the UTU, in violation of Section 2, Third, Fourth and Eleventh of the RLA.

The Kansas City Southern Railway court rejected all of these arguments.  The court first concluded that although the plaintiff had an interest in the ultimate result of the arbitration between the carrier and UTU, Congress did not intend a "mere interest in the subject or outcome" of a matter to require either statutory notice or a right to participate in negotiations.  The court next concluded that the provisions of the side letter did not violate Section 2, Eleventh(c) by forcing employees to hold dual union membership because it found Section 2, Eleventh(c) only applicable when the agreement that is being modified was negotiated as a  "union shop" agreement made pursuant to Section 2, Eleventh(a).  Because the agreement in question did not require membership in UTU as a condition of employment (i.e., "[n]o accumulated seniority in train service will be lost" if membership retention was declined), the court remained unpersuaded that the side letter imposed UTU membership as a condition of employment.  The court also concluded that because the side letter did not *require* dual union membership, but rather offered

it as an option, the agreement was nothing more than a union "negotiating terms with the employer that render membership in that union more attractive to some employees than membership in another union." Id. at 793.

Finally, the Kansas City Southern court concluded that the side letter did not violate Section 2, Third or Fourth of the RLA.  The court rejected the notion that the side letter allowed for the impermissible deduction of union dues, noting that Section 2, Eleventh(b) allows for this type of deduction as long as the parties agree to it, and then observed that the side letter did not provide for any wage deduction.

The court next rejected the plaintiffs' argument that the side letter coerced or influenced employees to join UTU rather than other unions.  In doing so, the Kansas City Southern court relied upon the pre-certification language of Trans World Airlines and, after observing that both BLE and UTU were well established at the time of the dispute, concluded that both unions were free to represent and could continue to represent engine service employees of the Kansas City Southern Railway.  Thus, the court found no coercion by the carrier or by the UTU.

Two years later, in Wightman v. Springfield Terminal Railway Co., 100 F.3d 228 (1st Cir. 1996), the Brotherhood of Locomotive Engineers and several of its individual members sought to enjoin the enactment of a clause in a recently negotiated collective bargaining agreement that required employees moving from train service to engineer service to pay dues to the United Transportation Union to maintain and continue to accrue their train service seniority.[14] The Brotherhood of Locomotive Engineers challenged this provision, arguing, among other

---

[14]  As previously noted, the Wightman case is distinct from the other cases, and more similar to this one, because the agreement in question affected not only the continued accrual of seniority, but also the maintenance of existing seniority.  Wightman, 100 F.3d at 232.

things, that the provision (1) violated the prohibition against mandated dual unionism stated in

Section 2, Eleventh(c), and (2) impermissibly interfered with employees' rights to organize and

choose their own collective bargaining representative under Section 2, Third and Fourth.

The Wightman court rejected each of these arguments, finding that the provision did not

violate the RLA in any way.  In rejecting the plaintiffs' first argument, the court noted that

"[n]othing in the language [of the provision] requires membership in UTU or any other union as

a condition of employment," and that the provision did not require an engineer "to choose

between dual unionship or unemployment" but simply to "choose whether to retain an continue

to accrue seniority in the train service craft."  Wightman, 100 F.3d at 231.  The court went on to

note that absent "a legislative pronouncement to the contrary," it is the union and carrier, and not

the RLA, that defines the "scope and significance of seniority rights" for workers.  Id. at 232.

The court therefore concluded that the provision did not violate Section 2, Eleventh of the RLA.

The Wightman court next addressed whether the provision violated Section 2, Third and

Fourth of the RLA.  Relying on Trans World Airlines, the court found that these sections of the

RLA "operate primarily in pre-certification contexts, where unorganized employees seek to

designate representatives and commence collective bargaining," and concluded that intervention

by a court in a post-certification dispute may only occur in "extremely limited circumstances".

Id. at 234.  The court specifically found intervention appropriate only in cases where a carrier has

demonstrated conduct "reflecting anti-union animus, an attempt to interfere with employee

choice of collective bargaining representative, discrimination, coercion . . . or acts of intimidation

that cannot be remedied by administrative means or commits a fundamental attack on the

collective bargaining process or makes a direct attempt to destroy a union."  Id.  After noting that

18

the provision in question reflected at most "sharp bargaining practices between unions in an effort to gain competitive advantage," the court found none of these factors present.

Finally, the court found that the plaintiffs' argument that the wage deduction provided for could only "pass muster" if it met the requirements imposed by Section 2, Eleventh to be without merit, because the provision neither referred to wage deductions nor forced them upon the employees. After noting that Section 2, Eleventh(b) allows for carriers and unions to enter into agreements to provide for the deduction of "periodic dues, initiation fees and assessments," the court concluded that the agreed upon dues deduction was permissible.

The imposition of a seniority maintenance fee was most recently addressed by the Court of Appeals for the Seventh Circuit in Corzine v. Brotherhood of Locomotive Engineers, 147 F.3d 651 (7th Cir. 1998). There, the Brotherhood of Locomotive Engineers and the Illinois Central Railroad Company entered into a collective bargaining agreement which allowed the BLE to levy a service fee on engineers who belong to the United Transportation Union. Corzine, 147 F.3d at 652. An engineer who did not pay the fee would have his or her seniority as an engineer frozen, enabling other UTU engineers who did pay the fee to pass the non-paying engineer on the seniority ladder. The UTU sued, arguing that the agreement violated Section 2, Eleventh(c) because it required UTU members to maintain dual union membership. Citing to all of the previous cases that had addressed the issue, the Corzine court soundly rejected this argument, finding that the agreement did not condition employment, but only affected the retention of seniority. This, the court concluded, was "a very different thing." Id. 654.

In their papers and at oral argument, Plaintiffs in this case argue that the appellate courts whose decisions are summarized above have erred in addressing whether these types of

19

agreements violate the RLA, primarily because these courts have treated Section 2, Fourth and

Eleventh as isolated from each other.  Plaintiffs argue that under Brady, this Court is compelled

to consider Section 2, Eleventh as a proviso to Section 2, Fourth, and that Trans World Airlines

is distinct from Brady because the circumstances in Trans World Airlines regarded self help after

a labor dispute, and did not address encouragement or discouragement to join a union.  When

read in this context, Plaintiffs argue that it "becomes clear" that the terms of the LOI are

coercive, and that the extraction of fees for the maintenance and retention of seniority is not

excused by Section 2, Eleventh.  Plaintiffs further argue that under Brady, there is no requirement

that the Court find an anti-union animus violation of Section 2, Fourth and that an employer's

behavior that might tend to encourage or discourage union membership may be construed as

violating Section 2, Fourth.

        While the tenets set forth in Brady certainly make sense in the context of that particular

dispute, the Court is not convinced that this case presents an analogous and, therefore, helpful

factual pattern.  Whereas the plaintiff in Brady was terminated by his employer for failure to pay

his union dues, none of the allegations in the Complaint here assert that any of the Plaintiffs have

lost their job for refusing to pay the security maintenance or security retention fee.  The Court

does not accept Plaintiffs' argument that allowing for the dormancy or, in some cases,

extinguishment, of seniority rights is tantamount to employment termination.[15]  Coercion requires

greater pressure than being presented with a choice one would prefer not to have to make if there

---

        [15]  The Court also does not agree with Plaintiffs that the other circuit courts of appeal
failed to properly consider Section 2, Fourth and Eleventh together.  Indeed, the Wightman court,
for example, specifically did so, stating "[r]ead together, §§ 152, Fourth and Eleventh(b) provide
that carriers may not unilaterally deduct dues from employee wages, but may do so upon the
agreement of all parties involved."  Wightman, 100 F.3d at 235.

is a chance one could "have it all" instead.

None of the provisions of the LOI provide that an engineer will lose his or her position as a result of non-payment of the seniority maintenance or seniority retention fee. Rather, the provisions of the LOI provide employees a choice as to whether to maintain or retain seniority in UTU. As was noted by the Wightman court, the parameters of seniority are defined by the collective bargaining agreement between the union and the carrier, and not by the RLA. Wightman, 100 F.3d at 232-33. Thus, the option of remaining a BLET member and allowing UTU seniority to drop does not amount to termination of employment. The LOI does not make joining the UTU a condition of employment. Moreover, the fact that seniority retention provisions of the LOI are only applicable in instances where a seniority maintenance and/or retention fee must be paid to BLET by trainmen who are presently working as engineers suggests that the carriers are not favoring one union over another, but rather allowing each union to obtain service fees to alleviate the expenses associated with meeting a union's obligation to continue to represent dormant members.[16]

At its root, this case is most clearly and most accurately seen not as a dispute between union workers and their employer, but as one between two unions, each of which wants to lure members from the other to further its financial security. The LOI serves to allow UTU to be paid for the services that it is legally obligated to provide, a proposition that has not been found to be unfair and, in fact, is part of the history underlying the creation of Section 2, Eleventh. See

---

[16] With respect to the amount of the fees to be paid under the LOI, the Court notes that UTU requires payment equivalent to full union dues to retain seniority rights. This Court joins with the Corzine court in observing that if the unions wanted to punctuate their stated raison d'etre to embrace the workers' interests, they could work to establish an agreement to share the costs of providing services to cross-over workers. Corzine, 147 F.3d at 655.

Rychlik, 352 U.S. at 489 (noting that Section 2, Eleventh was enacted, in part, because of an inherent unfairness in allowing non-union employees to enjoy benefits obtained by a union's efforts without paying any of the costs).  Because the LOI does not force employees to join UTU by threatening them with termination, the Court finds that it does not violate Section 2, Fourth of the RLA.

## 2.    Duty of Fair Representation

Plaintiffs next argue that the LOI violates Section 2, Fourth of the RLA because UTU's execution of the LOI constitutes a violation of UTU's duty of fair representation to the affected employees.  Complaint at ¶¶ 31-35.  Plaintiffs specifically argue that by agreeing among themselves to "engage in conduct that interferes with [BLET] members' employment rights," UTU has breached its duty of fair representation and that the Railroad Defendants have participated in allowing that breach.  Oral Arg. Tr. at 21:9-15.  As was conceded at oral argument by counsel for the Plaintiffs, the substance of this claim is dependent upon a finding that the LOI is illegal under Section 2, Fourth.  Oral Arg. Tr. at 21:15-17.  Because the Court has found that the LOI does not violate Section 2, Fourth, summary judgment will be granted in favor of the Defendants on this count of the Complaint.

## C.    Pennsylvania Civil Conspiracy Claims

Plaintiffs finally argue[17] that by conspiring to violate Section 2, Fourth of the Railway Labor Act, Defendants are liable under Pennsylvania law for civil conspiracy.  Complaint at ¶¶

---

[17]  In their papers and at oral argument, Defendants also argued that Plaintiffs' claims must be denied on the basis of collateral estoppel, based on the rulings of the other circuit courts of appeal.  Because the Court has conducted its own analysis of the claims, no collateral estoppel analysis is needed here.

44-46.  As was the case with the claim for breach of the duty of fair representation, this claim

also depends upon a finding that the LOI violates Section 2, Fourth of the RLA.  Because the

Court has found otherwise, summary judgment will be granted in favor of the Defendants with

respect to this count of the Complaint.

CONCLUSION

     For the reasons discussed above, the Court finds that the terms of the Letter of Intent do

not violate Section 2, Fourth or Eleventh of the Railway Labor Act.  Plaintiffs' Motion for

Judgment on the Pleadings will be denied, and the Motions for Summary Judgment filed by

United Transportation Union and the Railroad Defendants will be granted.  An appropriate Order

follows.


                S/Gene E.K. Pratter
                Gene E.K. Pratter
                United States District Judge


February 10, 2006

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **BROTHERHOOD OF LOCOMOTIVE** | : | **CIVIL ACTION** |
| **ENGINEERS AND TRAINMEN,** | : | |
| **MARTIN G. CROTHERS, AND** | : | |
| **GEORGE H. TOMPKINS,** | : | |
| **Plaintiffs** | : | |
| **v.** | : | |
| | : | |
| **UNITED TRANSPORTATION UNION,** | : | |
| **NATIONAL RAILWAY LABOR** | : | |
| **CONFERENCE, CSX** | : | |
| **TRANSPORTATION, INC., KANSAS** | : | |
| **CITY SOUTHERN, NORFOLK** | : | |
| **SOUTHERN RAILWAY COMPANY,** | : | |
| **AND UNION PACIFIC RAILROAD** | : | |
| **Defendants** | : | **No. 04-5491** |

**O R D E R**

**AND NOW,** this 10th day of February, 2006, upon consideration of the Motion for

Judgment on the Pleadings filed by Plaintiffs Brotherhood of Locomotive Engineers and

Trainmen, Martin G. Crothers and George H. Tompkins (Docket No.20), the Motions for

Summary Judgment filed by Defendants United Transportation Union (Docket Nos. 25, 26) and

BNSF Railway Company, CSX Transportation, Inc., Kansas City Southern Railway Company,

Norfolk Southern Railway Company, Union Pacific Railroad Company (Docket No. 29), and the

responses thereto (Docket Nos. 30, 32), it is **ORDERED** that the Motion for Judgment on the

Pleadings is **DENIED** and the Motions for Summary Judgment are **GRANTED**, and the Clerk

of Court is instructed to enter judgment in favor of the Defendants and against the Plaintiffs.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge